**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: May 29, 2009                    Decided: August 4, 2010)

Docket No. 08-1477-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

HOWARD HENRY,

        *Plaintiff-Appellant*,

v.

WYETH PHARMACEUTICALS, INC., WALTER WARDROP, ANDREW SCHASCHL, and
MICHAEL MCDERMOTT,

        *Defendant-Appellees*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:  LEVAL, POOLER, and PARKER, *Circuit Judges*.

Plaintiff appeals from the adverse judgment of the United States District Court for the Southern District of New York (Conner, *J.*), following a jury verdict in favor of defendants on discrimination and retaliation claims.  The Court of Appeals (Leval, *J.*) affirms the judgment with respect to plaintiff's discrimination claims, but vacates and remands for a new trial on the retaliation claims.

Steven Anthony Morelli, Law Office of Steven A. Morelli, P.C., Carle Place, NY (Eric S. Tilton, *on the brief*), for *Plaintiff-Appellant*.

Michael Delikat, Orrick, Herrington & Sutcliffe LLP, New York, NY (James H. McQuade, *on the brief*), for *Defendant-Appellees*.

LEVAL, *Circuit Judge*:

Plaintiff Howard Henry appeals from the adverse judgment of the United States District Court for the Southern District of New York (Conner, *J.*) in his suit against his former employer, defendant Wyeth Pharmaceuticals, Inc. ("Wyeth"), and former supervisors at Wyeth, following a jury verdict for defendants on his claims of racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*., 42 U.S.C. § 1981, and the New York State Human Rights Law, Exec. Law § 290, *et seq*.  Henry contends that the district court erred in granting two of defendants' motions in limine; by improperly instructing the jury as to his burden of proof; and by failing to provide counsel with a written copy of the jury charge prior to summations.  We find that any error committed by the district court with respect to Henry's discrimination claims was harmless, and thus affirm the judgment of the district court insofar as it relates to those claims.  We find, however, that the district court instructed the jury improperly as to the facts Henry was required to prove to prevail on his retaliation claims.  Accordingly, we vacate the portion of the judgment that relates to those claims, and remand for a new trial.

## BACKGROUND

## I. The Underlying Case

Plaintiff-appellant Howard Henry, an African-American male, began working for American Cyanamid, Wyeth's predecessor, in 1992, as a temporary employee in its Pearl River pharmaceutical manufacturing facility. The following year, he obtained a full-time position as a Chemist. In 1998, Henry was promoted to the position of Scientist II, and in 2000, he was promoted again, by defendant Walter Wardrop, to Production Engineer in the Consumer Health Division. After his promotion to Production Engineer, Henry's upward progress stalled, for reasons that form the basis of this dispute.

In December 2001, Henry applied for the position of Project Engineer. Hiring manager Kevin Costello selected Cara Muscolo, a white female, for the position. Costello stated that he selected Muscolo because, based on his prior experience with her, he believed that she would perform well, and because she had significant experience, including supervisory experience, which Henry lacked. Costello stated that he was also concerned that Henry, whom he had previously supervised, had difficulty multi-tasking. Henry testified that he believed Muscolo was qualified for the position, and that he did not attribute the decision to racial discrimination at the time it was made.

Henry received a year-end performance review from his supervisor, Wardrop, in 2001. Wyeth's practice was to break performance reviews down into several categories and provide employees with written feedback and a "rating" (between a low of "one" and a high of "five") in each category. Employees were also given composite ratings, which were intended to convey an overall impression of their performance throughout the year. Henry had received a composite

rating of "three" in all but one year prior to 2000, and in 2000, the first year in which Wardrop reviewed his performance, he received a "three" again. In 2001, however, Wardrop gave Henry a composite score of "four," and provided substantial praise in the explanatory portions of the review.

In July 2002, Howard applied for a promotion to Product Coordinator. He was interviewed for the position by Andrew Schaschl, the hiring manager, and Todd Davenport, an African-American manager. The position was awarded to Chris DeFeciani, a white male. Henry testified that DeFeciani was a "shoe-in for the position," Trial Tr. 118, because DeFeciani had "backfilled" for the outgoing Product Coordinator—i.e., filled in while the Product Coordinator was out of the office—and because DeFeciani was close friends with Schaschl. Henry testified that, after DeFeciani was hired, Henry told Schaschl he would like to backfill for DeFeciani if the opportunity arose. He also testified that, at the time, he did not think the decision was a product of discrimination. For his part, Schaschl testified that DeFeciani was "far and above" the best candidate for the position, and that Henry lacked the experience and training to be competitive. Trial Tr. 766-67.

In October 2002, Henry's cousin, with whom he shared a close relationship, was murdered by the "D.C. Sniper." As a result, Henry took two months off from work under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* When he returned to work, he was given his 2002 year-end performance review, on which he again received an overall rating of "four." Henry testified that at that point, he began pressing Wardrop for advice on how to improve his rating to a "five" and how to obtain promotions.

Three months after Henry returned to work, DeFeciani went on extended medical leave, and his position became available to "backfill." Though Henry had previously expressed an interest in backfilling the position, he testified that he did not reiterate that wish before Richard Morgan, a white male, was selected to fill in for DeFeciani. Some time later, Henry confronted Schaschl, who had been responsible for choosing DeFeciani's temporary replacement, and expressed his displeasure that he had not been selected. Schaschl testified that, even if Henry had made a timely request to be considered for the position, he would have selected Morgan, because in order to backfill, an employee needed the skills to "hit the ground running," and Henry lacked the training to step immediately into the role. Trial Tr. 800.

Henry testified that his relationship with Wardrop remained strong until September 2003, when he received a written mid-year performance review. Although Wyeth encouraged all managers to give employees mid-year reviews, Henry had not previously received one from Wardrop. On the review, Henry received the equivalent of a "three" rating, and Wardrop provided more extensive criticism than he had in the past. In particular, Wardrop noted that Henry had become increasingly tardy with assignments; that he had excessive absences; that he had been spending too much time lingering in the infirmary; and that he had not been responsive to pages. Wardrop testified that, as a result of these performance issues, he no longer felt comfortable giving Henry a rating that indicated he had "exceeded expectations." Henry vigorously disputed each of these criticisms. He testified that he believed the performance review was a response to his inquiries into promotional opportunities, and presented evidence that Joanne Rose, an HR representative at Wyeth, had instructed Wardrop to include a note about

Henry's nurse's office visits on the review.

In November 2003, Henry applied for the position of Process Engineer in the Vaccine Division. The position was awarded to Angel Montanez, a Hispanic male. Kirk Rokad, the hiring manager, said that he selected Montanez based on his superior experience and education. At his deposition, Henry explicitly testified that he did not believe he was denied the Process Engineer position because of his race.

Around the same time, Wyeth's Pearl River facility underwent a massive corporate restructuring known as the Organizational Cascade. A new corporate organizational chart was created, and all employees were reassigned from the top down, with each manager picking his direct reports. As a result of the Organizational Cascade, Henry was reassigned to the position of Packaging Supervisor, and to a new manager, Derek Burt. Wardrop testified that he chose not to retain Henry in his group because he was permitted to choose only one Production Engineer, and he selected Jean Colas, another African-American male, who had consistently outperformed Henry. Because the assignment did not affect Henry's salary or grade, Wyeth considered it a lateral move. Henry, however, considered it a demotion, because the position required a lower educational degree than his current position and involved tasks that he believed would not be as relevant for future promotions.

At the meeting where Henry received news of his reassignment, he was also given his year-end performance review, on which he received a "three." On it, Wardrop praised Henry in many areas, but noted that he was still failing to meet deadlines on a regular basis. Wardrop concluded that Henry was a "Solid Performer" overall but would "benefit from better reporting,

attention to deadlines." J.A. 511. Wardrop testified that he was also concerned that Henry had failed to make any progress on training he had been asked to complete. Henry testified that he took strong exception to his review, because he believed that his performance had remained consistent or had improved over the year—and thus he expected to receive the same "four" rating he had in the past. He also testified that he believed that the lower rating would make it more difficult for him to obtain promotions in the future, and that he believed it was a direct result of his pressing more aggressively for promotions.

Following his year-end review, Henry met with a series of managers to complain about his performance review and his reassignment to Packaging Supervisor. He met with Wardrop on January 5, 2004. Unsatisfied with Wardrop's explanation for his mediocre review, he complained to Andrew Schaschl on January 9, and three days later, on Schaschl's recommendation, to Joanne Rose. Rose testified that she offered to help Henry find alternate placement in the company if he did not wish to take the position in packaging, which offer he declined. On January 16, Henry called Richard Gaskins, the Pearl River facility's head of diversity. Henry testified that during the call he raised the issue of discrimination for the first time. The two also discussed more generally Henry's unhappiness with his reassignment and performance review.

On January 22, 2004, Henry met with defendant Michael McDermott, who was the managing director for the Pearl River facility and Schaschl's supervisor. Besides picking his own direct reports, McDermott's only involvement with the Organizational Cascade had been to give final administrative approval to all assignments made. Henry testified that, at the meeting,

7

he told McDermott, "It's going to be hard for me to explain how I go from this level going down to a packaging supervisor as an African-American." Trial Tr. 181. During his deposition, Henry testified that McDermott replied, "I'm all for diversity." Trial Tr. 429. However, at trial, he testified that McDermott responded, "I can see you are talking about diversity on campus, but I am not going to get into that silly discussion with you." Trial Tr. 181. McDermott testified that he had not called diversity "silly," and that he had not interpreted Henry's comments as an allegation of discrimination because they were oblique and casually made.

Finally, Henry met with Peter Bigelow, the head of manufacturing and vaccine operations at the Pearl River facility. At the meeting, Henry told Bigelow that he believed he was being subjected to racial discrimination and that he was extremely unhappy about his reassignment to packaging. In response, Bigelow reviewed Henry's prior performance reviews, which he told Henry he found to be "clear and objective." Trial Tr. 193. He also ordered an investigation into Henry's complaints, which was conducted over the course of a week by Eugene Sackett, an outside investigator, and which found no evidence of discrimination. Bigelow also offered Henry his choice of the Packaging Supervisor position or a Senior Validation Specialist position in the Vaccines Division, for which Henry had previously interviewed. Ultimately, Henry was granted a reprieve from his reassignment, and was permitted to remain in his Production Engineer position. However, he testified that he was not satisfied with that result, because he had hoped for a promotion.

Henry alleged that, in the wake of his complaints, his work environment changed, notwithstanding the fact that he was permitted to remain in his old position. Specifically, he

testified that his new supervisor, Andrew Espejo, "wanted time lines for everything," gave him additional duties, wrote him up for absences Henry had cleared in advance, and "started to develop a paper trail." Trial Tr. 196-99. In essence, Henry alleges that this behavior was part of a campaign to manufacture pretenses for future adverse employment actions.

Also in January 2004, Henry applied for the Staff Engineer I position in the Vaccines Division. He was not selected for the position. It went instead to James Patch, a white male with a Ph.D. in Chemical and Biological Engineering from Northwestern University, after it was turned down by Beelin Cheang, an Asian female who held a Ph.D. in Chemical Engineering from the University of Delaware. Henry possessed no degree beyond a bachelor's.

In May 2004, Joe Vitanza, Espejo's supervisor, instructed Espejo to maintain careful records with respect to Henry's "development plan," and to review it with Rose "so that we can ensure that it is done in accordance with current policies and procedures and hopefully has a positive outcome." Trial Tr. 1142-43. Two weeks later, Henry retained an attorney, who sent a letter to Wyeth formally stating Henry's claims of discrimination.

On June 28, Espejo gave Henry his mid-year performance review. Espejo forwarded the performance review to Rose, who testified that she had requested the review because there was "a higher level of concern" surrounding Henry's employment, stemming from Eugene Sackett's investigation. Trial Tr. 925. She testified that she "wouldn't say there would be a higher level of concern" owing to the receipt of the letter from Henry's attorney. Trial Tr. 926.

On September 24, 2004, Henry filed a formal charge of discrimination with the New York State Division of Human Rights and the U.S. Equal Employment Opportunity Commission

("EEOC"). Rose testified that she became aware of the charge at some point during the EEOC's investigation, but she did not specify when.

On October 1, Henry applied for a promotion to Manager of Manufacturing Support. Henry was one of ten employees selected to interview for the position, out of twenty-six who applied. The interviews were conducted by a panel consisting of Espejo, Muscolo, DeFeciani, and Burt. Henry testified that he believed the position was awarded after a panel interview, rather than through a more typical appointment process, because he was one of the applicants. The position was awarded to Max Katz, a white male. Henry testified that he believed he was more qualified than Katz because he had been working in the area for four years, whereas Katz came from a different department. When Katz was promoted, he became Henry's immediate supervisor, reporting to Espejo.

Henry was once again given a year-end performance review in 2004, and once again received a "three." The performance review generally attested to the fact that Henry was competent at his job, but noted that "Setting objectives and commitment dates and meeting those dates needs improvement." J.A. 552. Espejo testified that Henry's tardiness had begun causing compliance problems for the company. Henry refused to sign the appraisal because he did not believe it provided an accurate picture of his work over the course of the year.

On June 21, 2005, the EEOC sent Henry a "right to sue" letter, and sent a copy to Wyeth. Wyeth's copy was dated received on June 27. Meanwhile, on June 24, Katz and Espejo informed Henry he was being placed on a 30-day "Performance Improvement Plan" ("PIP"), a detailed plan allegedly designed to help Henry bring his performance in line with company expectations.

Katz testified that Rose assisted them during the initial planning stages of the PIP, but that Stacy Marroso was the primary HR representative responsible for the PIP. Espejo testified that the plan was intended to address Henry's frequent absences and his habitual failure to meet deadlines. Katz and Espejo both testified that, at the time the PIP was created, they were unaware of any of Henry's complaints of discrimination. Henry refused to sign the PIP when he met with Katz on June 24; the managers signed it on June 29. Henry successfully completed the PIP and was removed from it on July 25. However, he testified that Marroso told him that it rendered him "unpromotable" for one year. At trial, Rose disputed this characterization, saying that an employee was only "unpromotable" during the time he or she was on a PIP. Shortly after Henry was taken off the plan, he took a medical leave of absence, and never returned to work.

**II. Procedural History**

**A. Complaint**

On September 19, 2005, after he began his leave of absence, Henry commenced this action in the United States District Court for the Southern District of New York, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981; and New York State Executive Law, Human Rights Law § 290, *et seq.* by Wyeth in the form of denials of promotion, demotion, and retaliation. The complaint also alleged that three named individual defendants—Walter Wardrop, Andrew Schaschl, and Michael McDermott—aided and abetted violations of New York State Human Rights Law by participating in the denials of promotion, demotion, and retaliation. On December 19, 2005, defendant Schaschl filed a motion to dismiss the complaint, as it applied to him, for insufficiency of service of

process.  On February 8, 2006, the district court (Casey, *J.*) granted the motion by stipulation and order.

### B.  Summary Judgment Proceedings

Defendants then filed a motion for summary judgment.  On July 30, 2007, the district court (McMahon, *J.*),[1] granted the defendants' motion in part.  *Henry v. Wyeth Pharms., Inc.*, No. 05 Civ. 8106 (CM), 2007 WL 2230096 (S.D.N.Y. July 30, 2007) ("*Henry I*").  The court dismissed as time-barred (a) Henry's Title VII claims based on instances of alleged discrimination occurring before November 24, 2003 and (b) his NYHRL claims based on events occurring before September 20, 2002.  *Id.* at *29.  The court also dismissed all of Henry's claims based on his applications for Process Engineer in 2003 and Staff Engineer I in 2004 because Henry explicitly testified that he did not believe he was denied those positions on account of his race.  *Id.* at *32.  Finally, the court dismissed the Title VII claims against the remaining individual defendants, on the ground that individual defendants are not subject to liability under that statute.  *Id.* at *30.

The court, however, denied the motion with respect to Henry's remaining claims.  It found that Henry had met his burden of establishing *prima facie* cases of discrimination and retaliation.  *Id.* at *31.  It also determined that his response to defendants' proffered non-discriminatory bases for the challenged employment decisions consisted of more than mere conclusory statements and should be considered by a jury.  *Id.*

As a result of the district court's ruling, Henry proceeded with his non-time-barred

---

[1] Judge McMahon assumed the case following Judge Casey's death in March 2007.

discrimination claims based on nine events: (a) failure to promote him to the position of Project Engineer in December 2001; (b) failure to promote him to the position of Production Coordinator in July 2002; (c) failure to give him an interim appointment to the position of Production Coordinator in April 2003; (d) his receipt of an overall rating of "three" in his 2003 mid-year performance review; (e) his receipt of an overall rating of "three" in his 2003 year-end performance review; (f) his assignment to the position of Packaging Supervisor in the Organizational Cascade; (g) failure to promote him to the position of Manager Manufacturing Support in November 2004; (h) his receipt of an overall rating of "three" in his 2005 mid-year performance review; and (i) his placement on a PIP in June 2005.  Henry was also permitted to maintain claims based on alleged acts of retaliation following his filing of an EEOC complaint on September 24, 2004, namely: (a) denial of the Manager Manufacturing Support position; (b) his placement on a PIP; and (c) his 2005 mid-year performance review.

**C.  Motions In Limine**

The case was set for trial on February 4, 2008.  Defendants filed five motions in limine, which were not fully briefed until January 23, 2008.  In light of the proximity of the trial date and a request by the parties, the court (Conner, *J.*)[2] ruled on the motions in expedited fashion on January 29, when it issued an order in summary form granting four of the five motions.  *See Henry v. Wyeth Pharms., Inc.*, No. 05 Civ. 8106 (WCC), 2008 WL 294443 (S.D.N.Y. Jan. 29, 2008) (*"Henry II"*).  In its memorandum, the court did not address the parties' arguments or

---

[2] Judge McMahon reassigned the case to White Plains, NY, where it was transferred to Judge Conner.  *See Henry I*, 2007 WL 2230096, at *32.

explain the basis for its decisions, noting instead the parties' request that the court issue a decision as soon as possible so that they could adequately prepare for trial. *Id.* at *1.

Two of the motions in limine granted by the district court are at issue in this appeal: Motion No. 1, which concerned evidence of race-based remarks allegedly made by Wyeth managers to others at the Pearl River facility, and Motion No. 2, which concerned testimony by other Wyeth employees that they also experienced racial discrimination. *Id.*

*1. Motion in Limine No. 1*

On appeal, Henry challenges the district court's grant of defendants' motion in limine to exclude evidence of five race-related remarks allegedly made by Wyeth managers to other employees at the Pearl River facility.

*Robert Bracco's remarks.* Daisy Early, an African-American former employee of Wyeth, asserted that, in response to her complaint that she was being denied shift changes when similar requests were granted for white employees, her manager, Robert Bracco, said, "So sue me. All my supervisors are black so you can't prove discrimination," and that, after Bracco became ill, he told two other employees, "Daisy tried to put voodoo on me," pointing out parts of his body where Early had supposedly inflicted the voodoo. J.A. 42. Bracco did not participate in any of the employment decisions at issue in this appeal, but was involved in the decision to promote Henry to the position of Production Engineer in 2000.

*Joe Vitanza's "tar baby" remark.* Newton Paul, a Haitian-American former Wyeth employee, testified that in February 2004, he heard Joe Vitanza, the Managing Director of the Consumer Health Division at the Pearl River facility, refer to a malfunctioning alarm system as a

"tar baby that I just can't get off my back." J.A. 45. In their memorandum in support of the motion in limine, defendants claimed that Vitanza would have testified that he understood the term to mean "a difficult situation from which one has a hard time extricating himself." S.A. 7.

Vitanza was the supervisor of Walter Wardrop and Andrew Espejo; he was thus two levels directly above Henry in the corporate hierarchy. On May 6, 2004, Vitanza sent an email to Espejo directing him to "continue with the development plan" that Espejo had set up for Henry, and to "ensure that it is well documented, with clearly defined goals and time points." J.A. 526. He suggested that Espejo review it with Joanne Rose to "ensure that it is done in accordance with current policies and procedures, and hopefully, has a positive outcome." *Id.* Henry alleges that this documentation was used to lay a foundation for his placement on a PIP. Vitanza also appears to have been involved in the decisions to reassign Henry to the Packaging Supervisor position and to allow him to remain in his Production Engineer role.

*Walter Wardrop's remarks.* Early also asserted that she was stopped in the hallway one morning by defendant Wardrop, who said, "Daisy, what are you doing at home? Sticking pins in a doll? What have I ever done to you?" J.A. 42. When Early reported the incident to Michael Davenport, the Centrum Production Coordinator, he allegedly responded, "If you knew all of the things that had gone wrong that night, you would understand the statement." *Id.* Early testified that she was dismayed that the comment was seemingly acceptable to Wyeth management.

In addition, Paul testified that in the winter of 2004, he witnessed Wardrop mock Manny Rivera, a Hispanic employee at Wyeth. Paul testified that Wardrop pulled down his pants so that his waistband was around his thighs, and made gestures imitating Hispanic youth. Wardrop then

15

pointed to Rivera and said, "Is Manny the kind of guy to wear his pants hanging down like this?"

J.A. 45. Wardrop was Henry's direct supervisor until the Organizational Cascade, and is a

named defendant in this action.

*2. Motion In Limine No. 2*

The second motion in limine challenged on appeal was a motion to exclude "evidence of

the failure of Newton Paul to obtain a promotion . . . or evidence of racial discrimination against

other employees of defendant Wyeth Pharmaceuticals by decision makers different from those

responsible for preparing performance reports and/or making recommendations or decisions

relating to plaintiff's job assignments or promotions." *Henry II*, 2008 WL 294443 at *1.

Plaintiff offered no proof as to the content of the excluded evidence.

**D. Trial and Jury Instructions**

Henry also challenges the district court's handling of the jury instructions. The trial took

place from February 4 to February 15, 2008, when the jury returned a verdict for defendants on

all counts. On February 13, the court held a conference with counsel to discuss the parties'

proposed jury instructions. It informed the parties that it had taken the "essential substance" of

the defendants' proposed instructions, but made some editorial changes and eliminated some

redundancies. Trial Tr. 1425. Plaintiff's counsel asked whether the parties would be "afforded a

look-see at the charge." *Id.* at 1426. Judge Conner replied, "Of course, you may," but added, "I

don't have a copy to hand to you because I've made some almost illegible handwritten notes that

are in my private Sanskrit." *Id.* The parties, however, were never shown the draft of the charge

before it was delivered to the jury.

16

In its initial jury charge, the district judge laid out the framework for employment discrimination cases established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and discussed the elements of the *prima facie* case of discrimination and retaliation. He directed the jury to follow the three-step burden-shifting analysis set out in *McDonnell Douglas* if it found plaintiff had met his burden of establishing a *prima facie* case. Plaintiff's counsel then objected to a statement by the judge that, in order to prevail on his discrimination claims, Henry was required to establish that the rationale advanced by Wyeth for each of the challenged employment decisions was "false," rather than "pretextual." The court agreed to instruct the jury that Henry need only prove that the proffered reasons were pretextual.

Defense counsel in turn objected to the court's characterization of the causation element of a *prima facie* case of retaliation. He argued that, in order to establish causation, Henry needed to show that the individuals responsible for the adverse employment actions knew Henry was engaging in a protected activity. The court agreed, and clarified its understanding of the causation requirement in a supplemental instruction to the jury.

After the jury began deliberations, it sought clarification on one of the retaliation claims. In response, the court again instructed the jury, over the objections of Henry's attorney, that in order to prevail, Henry was required to show that individual decision-makers had known of his EEOC complaint.

The jury returned a verdict in favor of defendants on all claims, and on March 7, 2008, the court entered a judgment closing the case.

## DISCUSSION

17

Henry alleges that the district judge made multiple errors with respect to exclusion of evidence and handling of jury instructions on both his retaliation and discrimination claims. Because the district court incorrectly instructed the jury regarding the facts Henry was required to prove to prevail on his retaliation claims, we vacate the district court's judgment on those claims. We affirm the judgment on the discrimination claims, finding any error related to those claims to be harmless.

**I. Retaliation Claims**

Henry first argues that the district judge improperly instructed the jury as to Henry's burden of proof on his retaliation claims. We review the propriety of jury instructions de novo, *United States v. George*, 386 F.3d 383, 397 (2d Cir. 2004), and will find error if "the jury was misled about the correct legal standard or was otherwise inadequately informed of controlling law." *Crigger v. Fahnestock & Co*., 443 F.3d 230, 235 (2d Cir. 2006) (internal quotation marks omitted).

At the conclusion of the trial, the district judge instructed the jury:

> In determining a claim of retaliation, you follow a three-step analytical process . . . . In step 1, the plaintiff must establish a *prima facie* case by proving by a preponderance of the evidence each of the following four elements.
> The first element is that plaintiff engaged in an activity protected under the antidiscrimination statutes. . . .
> The second element that the plaintiff must prove in order to make out a *prima facie* case is that the employer was aware of the protected activity, in other words, aware that a complaint had been made about alleged racial discrimination. I don't think there's any dispute about the fact that shortly after the EEOC complaint was filed by the plaintiff that the defendant Wyeth and its responsible officials knew about it.
> Third, the employer took a materially adverse action against the plaintiff. . . .

Fourth, that a causal connection existed between plaintiff's protected activity and the adverse action taken by the employer. I think with respect to that fourth one, there is considerable dispute. And that's where your deliberation should be concentrated. Plaintiff must present to you sufficient evidence to permit a reasonable inference that the adverse employment action was taken in retaliation for his filing of a complaint of race discrimination.

Trial Tr. 1568-69.

After this instruction was read, defendants' counsel contended that it was a disputed issue whether Espejo and Katz, the supervisors immediately responsible for the allegedly retaliatory actions, had any knowledge of Henry's complaints and that, "at least *for the causal connection element*, there has to be a showing that the individuals who took the retaliatory action if it wasn't imposed by corporate had knowledge of the protected activity." Trial Tr. 1589-90 (emphasis added). Defendants' counsel requested a supplemental instruction that, in order for Henry to make out a *prima facie* case of retaliation, he needed to show that the individuals who made the allegedly retaliatory decisions (i.e., Katz and Espejo) had knowledge of his engaging in a protected activity.[3] Plaintiff's counsel argued that Henry was not required to demonstrate anything more than general corporate knowledge, but the court gave the jury a supplemental instruction that

the plaintiff, in order to establish that causation link, has to establish that the person responsible for making the employment decision or action knew that the complaint had been filed, the informal complaint within the company had been filed, and that the action was in retaliation for the making of that complaint or charge of race discrimination.

Trial Tr. 1595.

_____

[3] The defendants did not argue that such a showing was necessary in order to meet the "knowledge" requirement; they conceded that general corporate knowledge was sufficient.

19

The next morning, the jury sought clarification on the supplemental instruction as it applied to the PIP. Regarding the causal connection requirement, the court responded:

> The person who made the decision or the persons who made the decision to place the plaintiff on a performance improvement plan must have known that a complaint had been filed, and that means that the individual must have known and must have acted to place him on the plan in retaliation for his having filed the complaint of race discrimination.

Trial Tr. 1617. After the instruction was read, Henry's attorney renewed his objection, again on the ground that nothing more than general corporate knowledge was required, but was overruled by the district judge, who explained, "Well, you can't really act with a causal connection unless you have underlying knowledge. How can you place somebody on an improvement plan in retaliation for filing the complaint if you didn't know that the complaint had been filed or made?" Trial Tr. 1619-20.

We believe the court erred in this instruction. In *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000), we stated, "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." We then rejected the argument that in order to satisfy the causation requirement, a plaintiff must show that the particular individuals who carried out an adverse action knew of the protected activity. *Id.* at 117. Instead, we indicated that a jury may

> find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.

*Id. See also Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (noting that a plaintiff can establish causation by showing protected activity was closely followed in time by adverse employment action); *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).

*Gordon* directly addressed the situation in which a corporate agent *carries out* an adverse employment action on the *orders*, explicit or implicit, of a superior with knowledge that the plaintiff has engaged in a protected activity. However, in order to show causation in the sense required by *McDonnell Douglas*—that is, a causal connection between the protected activity and the adverse employment action—it is not necessary that the supervisor who has knowledge of the plaintiff's protected activities have *ordered* the agent to impose the adverse action. A causal connection is sufficiently demonstrated if the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity acts pursuant to *encouragement* by a superior (who has knowledge) to disfavor the plaintiff.

Because Henry presented evidence at trial sufficient to permit a jury to find causation in this sense, the district court's erroneous instruction was not harmless. *Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 73 (2d Cir. 2004) ("Unless 'convinced that [an erroneous instruction] did not influence the jury's verdict,' we will reverse and grant a new trial.") (quoting *Gordon*, 232 F.3d at 116)). Henry's evidence of retaliation, while not overwhelming, was sufficiently strong that a jury could have returned a verdict in his favor, if properly instructed. For instance, Henry introduced evidence that might have prompted a jury to believe that Espejo and Katz were acting under orders, or at least encouragement, explicit or implicit, from Rose to retaliate against

Henry—namely, that Rose became aware in January 2004 that Henry had made internal complaints of discrimination; that in May 2004, Vitanza, Espejo's supervisor, instructed Espejo to review his documentation of Henry's work with Rose; that Rose requested and received a copy of Henry's 2004 mid-year performance review from Espejo because there was a "higher level of concern," Trial Tr. 925, stemming from Eugene Sackett's internal investigation (though Rose denied that it stemmed from any awareness of discrimination charges in particular); that Rose became aware of Henry's EEOC complaint at some point when it was still being investigated by the Commission; and that Rose was initially involved in setting up Henry's PIP. (Henry also argued that causation could be inferred from the fact that retaliatory actions followed close on the heels of his engaging in protected activities.)

We need not find Henry's evidence of causation compelling; to merit reversal, we need only find that the erroneous jury instruction may have influenced the jury's verdict. *Gordon*, 232 F.3d at 116. Henry has met that standard, and accordingly we vacate the portion of the judgment that pertains to those claims.

## II. Discrimination Claims

Henry argues that the district court erred with respect to his discrimination claims by (1) granting defendants' motion in limine to exclude testimony regarding certain racially motivated remarks allegedly made by defendant Wardrop and other supervisors; (2) granting defendants' motion in limine to exclude testimony by other African-American Wyeth employees regarding their own subjective perceptions of discrimination; (3) failing to provide counsel with a copy of the jury charge prior to summations; (4) including elements of the *McDonnell Douglas* burden-

shifting framework in the jury charge; and (5) instructing the jury that Henry was required to prove that Wyeth's proffered justifications for its employment decisions were pretextual.

**A. Motion In Limine No. 1**

Henry alleges that the district court erred by granting defendants' motion to exclude testimony relating to the race-based remarks allegedly made by Robert Bracco, Joe Vitanza, and Walter Wardop. The court ruled:

> Plaintiff will not be permitted to introduce at the trial of this action evidence relating to (1) the "sue me" remark allegedly made by Robert Bracco to Daisy Early in the spring of 2001; (2) the "voodoo" remarks allegedly made by Robert Bracco . . . a short time later; (3) the "sticking pins" remark allegedly made by Walter Wardrop to Daisy Early during the same time period; (4) the "tar baby" remark made by Joe Vitanza in February 2004; (5) the "pulled down pants" gesture and related remarks allegedly made by Walter Wardrop in the winter of 2004.

*Henry II*, 2008 WL 294443 at *1.

A district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 269 (2d Cir. 1999). Evidence should be excluded if it is irrelevant, Fed. R. Evid. 402, or, even if relevant, if its probative value is substantially outweighed by the danger of unfair prejudice it presents. Fed. R. Evid. 403. In *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111 (2d Cir. 2007), we clarified the approach district courts should take when considering whether isolated "stray remarks" are probative of discriminatory intent:

> [T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. . . . The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.

23

*Id.* at 115 (internal citation omitted).

The district courts in this circuit have developed a standardized approach for applying these concepts to individual cases. In determining whether a remark is probative, they have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process). *See, e.g.*, *Adam v. Glen Cove Sch.*, No. 06-cv-1200 (JFB) (MLO), 2008 U.S. Dist. LEXIS 13039 at *24 n.8 (E.D.N.Y. Feb. 21, 2008); *McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 83 (D. Conn. 2005) (citing *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004)). While we caution that none of these factors should be regarded as dispositive, we think this framework will often provide a useful approach to the admission or exclusion of remarks not directly related to the adverse action against the plaintiff, and employ it here.

*1. Bracco's remarks*

Bracco allegedly made three discriminatory comments: the "sue me" remark and the two "voodoo" remarks, all of which were made to or about Daisy Early. Though Bracco was senior to Henry, and was involved in the decision to promote Henry to Production Engineer, it does not appear that Bracco was involved in any of the decisions that Henry alleges were discriminatory. Additionally, the comments were allegedly made years before most of the events at issue, and were unrelated to the decision-making process. Thus, although a reasonable juror could certainly

24

have considered the remarks discriminatory, they have little probative value in the context of this case. Because testimony relating to the remarks would have been, at best, only marginally relevant, we are confident the district judge acted well within his discretion when he excluded it under Rule 403.

### 2. *Vitanza's "tar baby" remark*

Vitanza was two levels above Henry in the corporate structure. He was thus Henry's supervisor, albeit not his most direct one. Henry alleges that Vitanza was involved in at least one discriminatory action against him—his placement on the PIP—and that Vitanza instructed Andrew Espejo to closely monitor Henry's performance, to pave the way for future disciplinary actions. Additionally, the "tar baby" remark was allegedly made around the time that the incidents giving rise to Henry's suit occurred. However, the remark was not related to the decision-making process. Moreover, while a reasonable juror might have found the remark offensive, it is less clear that a reasonable juror would have found it indicative of a discriminatory animus. *See Tomassi*, 478 F.3d at 116 ("The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."). Thus, we conclude that the remark had some, but not great, probative value.

In addition, admission of testimony regarding the remark had the potential to be unfairly prejudicial to the employer. "Unfair prejudice" is that which might dispose a jury to render a verdict for reasons unrelated to the merits of the case. *Leopold*, 174 F.3d at 270. Vitanza's remark might have sufficiently offended members of the jury that they would feel inclined to rule

against defendants, merely to punish Wyeth for continuing to employ him. The district court's decision to exclude testimony pertaining to the remark in light of its low probative value and prejudicial nature was either within the range of permissible decisions or was in any event harmless error.

### 3. *Wardrop's remarks*

Wardrop allegedly made two race-based remarks: the "voodoo" remark to Daisy Early, and the "low pants" remark and gesture about Manny Rivera. Wardrop was Henry's direct supervisor and a decision-maker in some of the events at issue and is a defendant in this case. While he allegedly made the "voodoo" remark years before Wardrop participated in any challenged employment decision, he made the other around the time of the Organizational Cascade. The content of each remark could have been reasonably construed to be discriminatory by a juror. Thus, although the comments were not uttered in a decision-making context, they could have had probative value. Though the jury might have found the evidence of the comments unpersuasive or, even if believed, their significance limited, they were relevant.

Under the circumstances, however, if it was error to exclude them, the error was harmless. We find it unlikely that a juror would have been persuaded to change his vote on the basis of the excluded testimony, in light of the overwhelming evidence that Wardrop was not so motivated. The only challenged actions to which Wardrop had any connection were Henry's mid-year and year-end performance reviews in 2003, and his assignment to a different department following the Organizational Cascade. However, Wardrop provided detailed and convincing explanations for those allegedly adverse actions, both at the time and at trial.

Moreover, there was substantial circumstantial evidence that Wardrop did *not* harbor a discriminatory animus: Wardop was primarily responsible for the initial decision to promote Henry to the Production Engineer position, and he selected Henry from an almost exclusively all-white field. Additionally, before being assigned to Wardrop, Henry had received only one composite rating of "four" on a performance review in his seven years at Wyeth; Wardrop rated him a "four" in two consecutive years. Finally, Jean Colas, whom Wardop opted to retain in Henry's position following the Organizational Cascade, was also an African-American, and had received substantially better performance reviews from Wardrop than Henry.

In light of this evidence, plus the considerable evidence that Wardrop's employment decisions were not motivated by racial animus, we find it quite unlikely that admission of the improperly excluded evidence would have prompted the jury to reach a different result. Accordingly, we conclude that any error in granting defendants' first motion in limine was harmless.

**B. Motion In Limine No. 2**

Henry also alleges that the district court erred by refusing to admit evidence of racial discrimination against other Wyeth employees "by decision makers different from those responsible for preparing performance reports and/or making recommendations or decisions relating to plaintiff's job assignments or promotions." *Henry II*, 2008 WL 294443 at *1. Specifically, Henry argues that the district court's summary, blanket prohibition is contrary to the later-decided *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379 (2008), which held that evidence by nonparties alleging discrimination at the hands of supervisors who played no

role in challenged employment decisions is "neither *per se* admissible nor *per se* inadmissible," *id.* at 381, and that district courts must engage in a "fact-intensive, context-specific inquiry" to determine whether to exclude such evidence under Rule 403. *Id.* at 388.

We need not attempt to determine whether the district court engaged in the type of fact-intensive inquiry required by *Mendelsohn*. Even assuming the district judge improperly applied a blanket exclusionary rule, there was no reversible error because plaintiff made no offer of proof as to the content of the excluded evidence. *See* Fed. R. Evid. 103(a). While an offer of proof is not "an absolute prerequisite in every appeal from the exclusion of evidence," it is required where, as here, "the significance of the excluded evidence is not obvious or where it is not clear what the testimony of the witness would have been or that he was even qualified to give any testimony at all." *Fortunato v. Ford Motor Co.*, 464 F.2d 962, 967 (2d Cir. 1972). Here, Henry's counsel went so far as to *refuse* to reveal the content of the proffered testimony, arguing in his Memorandum of Law in Opposition to Defendants' Motion In Limine:

> Defendants have absolutely no idea what the witnesses they identified in their memorandum of law will testify to. Defendants are simply guessing that those witnesses might testify about their own discriminatory experiences. . . . Accordingly, even if this Court were inclined to grant Defendants' motion in limine number 2, it should reserve decision on the motion until the time of trial, if the issue comes up at all and Defendants make their objection, so that the Court may make a determination then, after having heard the context, nexus, temporal proximity and circumstances surrounding the testimony.

Def.'s Supplemental App. 39-40.

It is not the district court's duty to attempt to extract from a party details about what evidence he plans to present. Nor is the court obliged to wait until trial, and see what kind of

28

evidence he shows up with. Rather, when the opposing party has made a motion to exclude potential evidence, the burden falls on the non-movant (here, Henry) to describe the content of the evidence and its relevance to the case. In light of Henry's refusal to do so, the district court could not have reasonably admitted the evidence, even if it had engaged in the most intensive "context-specific" inquiry possible. Accordingly, even if we assume the district court applied an incorrect standard when weighing the exclusion of the challenged testimony, we cannot conclude that the error could have affected the outcome of the case, as is required to warrant reversal. *See* Fed. R. Evid. 103.

## C. Failure to Provide Jury Charge Prior to Summations

Henry next argues that the district court's apparently inadvertent failure to provide a copy of the jury charge to counsel prior to summations entitles him to a new trial. Fed. R. Civ. P. 51 states:

> The court must (1) inform the parties of its proposed [jury] instructions and proposed action on the requests before instructing the jury and before final jury arguments; [and] (2) must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered.

Under the circumstances, we need not take up the complex issue of the specificity with which a district court must describe its proposed jury instructions in order to comply with Rule 51, because Henry's counsel did not properly object to the district judge's failure to provide a copy of the instructions. His casual request to have a "look-see" at them, which was not renewed at a time when a written copy was available, does not suffice. *See United States v. Civelli*, 883 F.2d 191, 194 (2d Cir. 1989), *cert. denied*, 493 U.S. 966 (1989) (a proper objection "must direct the

trial court's attention to the contention that is going to be raised on appeal"). Having failed to object, Henry must demonstrate that the district court's actions constituted plain error, which he cannot do.

The purpose of Rule 51 is to "allow both parties to mold their closing arguments to the points of law that will be explained in the final jury charge." *Gordon*, 232 F.3d at 118 (citing *Wiedersum Assocs. v. Nat'l Homes Const. Corp.*, 540 F.2d 62, 65-66 (2d Cir. 1976)); *accord United States v. James*, 998 F.2d 74, 79 (2d Cir. 1993), *cert. denied*, 510 U.S. 958 (1993). Henry identifies only one way in which his summation would have differed had he known how the jury would have been charged: he says his counsel would have adjusted for the court's erroneous causation instruction on the retaliation claims by arguing more vigorously that Espejo and Katz knew Henry was engaging in a protected activity. However, because that change would have had no effect on Henry's closing arguments with respect to his discrimination claims, he cannot establish that the district court's error, if it was error, affected the jury's verdict on those claims.

**D. Inclusion of Elements of the *McDonnell Douglas* Burden-Shifting Framework**

Henry also contends that the district court erred by incorporating elements of the three-step *McDonnell Douglas* burden-shifting framework into its jury charge. Because Henry failed to object to the inclusion of the *McDonnell Douglas* framework, we review its inclusion for plain error. *See Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 96 (2d Cir. 1998); Fed. R. Civ. P. 51(d)(2).

The district judge instructed the jury:

> To establish a claim of race discrimination against Wyeth . . . plaintiff has the

burden to prove by a preponderance of the evidence that his race or color was a motivating factor in Wyeth's employment decision or action . . . .

The determination of a claim of discrimination involves a three-step process. In the first step, in order to prove discrimination by failure to promote, plaintiff has the initial burden to prove by a preponderance of the credible evidence what is called a *prima facie* case by proving two things by a preponderance of the evidence. One, that he applied for and was denied a promotion to a position for which he was qualified; and two, that the denial of the promotion occurred under circumstances giving rise to an inference of discrimination. . . .

To prove discrimination by an unfavorable performance evaluation, in this first step the plaintiff must prove by a preponderance of the credible evidence that his evaluation resulted in an adverse change in the terms and conditions of his employment, and that the circumstances give rise to an inference of discrimination. If you find that plaintiff has failed to prove either of these essential elements with regard to either to his promotion or unfavorable performance evaluation claims, you need not deliberate any further. You will be in effect returning a verdict in favor of the defendants on that particular claim.

However, if you find that both of those elements have been proved by a preponderance of the evidence with respect to either plaintiff's claim for discrimination in failure to promote or his claim of discrimination by unfavorable performance evaluations, you should then proceed to the second step, which is to determine whether Wyeth has given any legitimate, nondiscriminatory reason for its decision or action.

Wyeth does not have to convince you that the reason it advances is true, that is, that it's the real reason for the decision or action. It merely has to suggest a plausible reason for it. So the sole issue at this second stage of your analysis is whether Wyeth has advanced a legitimate, nondiscriminatory reason for its employment decision or action concerning the plaintiff.

If Wyeth satisfies its burden by presenting evidence to show a nondiscriminatory reason for its employment action or decision, you then proceed to the third step in the analysis, which is to determine whether plaintiff has satisfied you by a preponderance of the credible evidence that the reason offered by Wyeth for its decision or action is only a pretext or coverup for what was in truth a racially discriminatory motive. Thus, plaintiff must establish both that the reason advanced by Wyeth was false, and that the discrimination was a motivating factor in Wyeth's decision or action.

Now, in determining whether plaintiff's race was a motivating factor in an employment decision or action, you should understand that the plaintiff's race need not have been the sole or exclusive factor motivating the employer's decision or action. There may have been many factors motivating a decision. Plaintiff's status in a protected class such as African-American may be one of many factors. But it

must be a motivating factor, that is, a factor that significantly influenced the decision.

Trial Tr. 1563-66.

This charge incorporated elements of the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which

> [T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. If such a reason is provided, plaintiff may . . . prevail by showing, [by a preponderance of the evidence,] that the employer's determination was in fact the result of racial discrimination.

*Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802). We have previously cautioned that "trial judges should not 'import[] uncritically' language used in the traditional . . . *McDonnell Douglas* formulation into jury charges because such language—developed by appellate courts for use by judges—is 'at best irrelevant, and at worst misleading to a jury.'" *Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 223 (2d Cir. 1997) (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994)). In *Gordon*, we reiterated this principle:

> The jury therefore does not need to be lectured on the concepts that guide a judge in determining whether a case should go to the jury. . . . [W]hen the district court included these concepts as part of its jury charge by using the *McDonnell Douglas* framework, it created a distinct risk of confusing the jury.

232 F.3d at 118.

In this case, the risk of confusing the jury was not sufficiently serious to warrant reversal under the stringent plain error standard. We see no reason to suspect that inclusion of this superfluous language obscured the jury's ultimate task—to determine whether race was a

motivating factor in an adverse employment action.  The district judge began and ended his charge with the correct legal standard.  Moreover, the verdict sheet directed the jury to the correct question—whether Henry had "proved by a preponderance of the credible evidence that his race or color was a motivating factor in" certain employment actions. J.A. 790.  We find it significant that Henry does not even attempt to articulate a basis for his assertion that inclusion of the framework was prejudicial to his case, and instead merely cites *Gordon* for the proposition that it is "at best irrelevant, and at worst misleading to a jury."  That falls far short of the showing of prejudice required to justify reversal on plain error review.

**E.  The Court's Requirement That Henry Prove Wyeth's Proffered Reasons Were "Pretextual"**

Finally, Henry argues that the district court erred by instructing the jury that, in order to prevail, he must prove that Wyeth's stated justifications for the adverse employment decisions were pretextual.

As set forth above, the court instructed the jury regarding the *McDonnell Douglas* three-step burden-shifting process.  It told the jury to determine: first, whether Henry had first satisfied his burden to show a prima facie case of discrimination; second, whether Wyeth had "advanced a legitimate nondiscriminatory reason for its employment decision"; and third, if both parties had satisfied their burdens, whether Henry had proven "by a preponderance of the credible evidence that the reason offered by Wyeth for its decision or action is only a pretext or coverup for what was in truth a racially discriminatory motive."  Trial Tr. 1565-66.

After the charge was read, Henry's attorney objected to the requirement of showing that

Wyeth's stated reason was "false." Henry argued that the employer's stated reason "doesn't have to be a false reason," as opposed to a "pretext." Trial Tr. 1588. The judge responded that he didn't think there was a significant difference between the terms, but provided the jury with the following supplemental instruction:

> [P]laintiff is required to show not only that that reason advanced by the defendant was a pretext or coverup for the improper employment action, but also that the real reason for the employment action was race discrimination or retaliation.
>    Now, I'm told that I said the plaintiff has to prove that the articulated reason was false. He doesn't have to prove that. It may be a real reason. But it has to be shown to be a mere pretext, in other words, something other than the real reason for the employment action or decision.

Trial Tr. 1595-96. Henry made no further objections.

Although Henry, having requested that the court charge on "pretext," cannot be heard on this appeal to object to the charge, we think it is unwise for a court to charge the jury that a plaintiff must prove that the employer's explanation of an adverse action was a "pretext." Such an instruction has a likelihood of confusing the jury and adding inappropriately to the plaintiff's burden. At least some of the most prominent dictionary definitions of "pretext" and of "pretend," from which it derives, include the intent to deceive.[4] A jury instructed that the plaintiff must prove that the employer's explanation is a "pretext" is likely to understand that the plaintiff must prove that the employee offered the explanation with a conscious intention of deceiving by concealing its discrimination. This is especially so when, as in the present case, the court

---

[4] For example, Webster's Third New International Dictionary (1976 ed.) offers the following definitions: "Pretext: a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs." "Pretend:. . . 2a: to make believe; feign, sham. b: to hold out, represent or assert falsely: . . . show hypocritically or deceitfully."

associates the word "pretext" with "coverup."

In proving a case under Title VII, following the defendant's proffer of a justification, a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus. *Gordon*, 232 F.3d at 117 (holding that defendant can prevail "by proving that a discriminatory motive, more likely than not, motivated the defendants" (internal quotation marks omitted)). *See also Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (explaining that to prevail, plaintiff must prove "that the defendant's employment decision was more likely than not based in whole or in part on discrimination" (internal quotation marks omitted)); *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (explaining that defendant entitled to prevail "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination"). A plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally furnishing a justification known to be false.[5] The crucial element of a claim under Title VII is discrimination,

---

[5] We previously addressed this point in *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116 (2d Cir. 1997), where we wrote:

> Though there are sentences in some opinions to the effect that a Title VII plaintiff must prove "*both* that the [defendant's proffered] reason was false, *and* that discrimination was the real reason," these decisions do not require a finding of pretext in addition to a finding of discrimination; they make the quite different point that a Title VII plaintiff may not prevail by establishing only pretext, but must prove, in addition, that a motivating reason was discrimination. But though a plaintiff may not prevail only by showing that a proffered explanation is a pretext, it is not required to make such a showing. Since a plaintiff prevails by showing that discrimination was *a* motivating factor, it can invite the jury to ignore the defendant's proffered legitimate explanation and conclude that discrimination was a motivating factor, whether or not the employer's proffered explanation was also in the employer's mind.

*Id.* at 121 (quoting *St. Mary's*, 509 U.S. at 515) (citations omitted).

not dishonesty.

We recognize that courts often speak of the obligation on the plaintiff to prove that the employer's explanation is a "pretext for discrimination."  We believe this is either a shorthand for the more complex concept that, regardless of whether the employer's explanation also furnished part of the reason for the adverse action, the adverse action was motivated in part by discrimination, or a misunderstanding of dicta in Supreme Court opinions.  In *Texas Deptartment of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the Court stated in dicta that, "should the defendant carry [its] burden [of furnishing a non-discriminatory reason for its adverse action], the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253.  The Court revisited this statement in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  The Court held in *St. Mary's* that a factfinder's rejection of an employer's asserted justification for an action did not, standing alone, entitle the plaintiff to judgment as a matter of law.  The majority and the dissenting justices disagreed over the proper significance under the *Burdine* dictum of jury rejection of the employer's asserted justification for its actions.  The dissenting justices construed *Burdine* to mean that a plaintiff who disproved the employer's asserted justification was entitled to judgment as a matter of law on his

---

Notwithstanding our admonition in *Fields*, district courts in the intervening years have continued to instruct juries that pretext is, in effect, a required element of plaintiff's claim which must be proved by a preponderance of the evidence.  Plaintiff has *no such burden*; in all cases, plaintiff sustains his burden if he proves that an adverse employment decision was motivated by discrimination, regardless of whether he is able to additionally show that the employer's asserted justification for the decision was "pretextual."

discrimination claim. Justice Scalia, writing for the majority, responded that "a reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.* at 515.

Putting aside the fact that in both cases the reference to "pretext" was dictum, we think it clear that in neither case did the Supreme Court intend to impose on the plaintiff a requirement of proving intent to deceive. It seems clear from the discussion that what the Court meant by its reference to the falsity of the employer's asserted justification was not intent to deceive, but inaccuracy or incompleteness resulting from the failure to include the fact of the discriminatory motivation. In context, it is amply clear that the import of the statements in both *Burdine* and *St. Mary's* was *not* that plaintiff was required to prove the employer's stated justification was asserted with intent to deceive or in bad faith. It was rather that no plaintiff could prevail without establishing, by a preponderance of the evidence, that discrimination played a role in an adverse employment decision.

To require a plaintiff to prove that the employer acted with conscious intent to deceive as to its reasons imposes a burden not envisioned by the statute. There are many circumstances in which a jury may justifiably find a prohibited discriminatory motivation notwithstanding a different explanation given by the employer in good faith without intent to deceive. One such circumstance exists where the adverse decision is made by two or more persons, some of whom are motivated by discrimination, while others are motivated by other reasons, and the employer's innocent explanation emanates from those who had no discriminatory motivation and were unaware of their colleagues' discriminatory motivation. In such cases, the explanation given by

the employer will be based on incomplete information, but not an intent to deceive.[6] In short, what the statute prohibits is discrimination in employment. It does not require proof in addition of deceitful misrepresentation.

Plaintiff in this case cannot be heard to complain of the court's charge on "pretext" because he requested it. Accordingly, our observations on the inappropriate nature of such a charge have no effect on this appeal.[7] Nonetheless, for the future we caution district courts to avoid charging juries to the effect that a plaintiff must show that the employer's stated reason for an adverse action was a "pretext." It is sufficient for a plaintiff to prove that discrimination played a role in motivating the adverse action taken against the plaintiff.

**CONCLUSION**

The order of the district court dated March 7, 2008 is hereby AFFIRMED with respect to Henry's discrimination claims, VACATED with respect to his retaliation claims, and REMANDED for further proceedings.

---

[6] Another such circumstance may arise where the decisionmaker is unaware of his own discriminatory motivation and may believe in good faith that his different explanation honestly accounts for the decision, without awareness of the extent to which his judgments are influenced by ingrained discriminatory attitudes which have been proved to the jury.

[7] Because our observations do not form a part of our reasons for ruling in favor of the party winning judgment, they are dicta.