Lenzi v. Systemax, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: April 17, 2019                    Decided: December 6, 2019)

Docket No. 18-979

_____

DANIELLE LENZI,

*Plaintiff-Appellant*,

v.

SYSTEMAX, INC., RICHARD LEEDS, Chairman
and CEO (and in his individual capacity),
LAWRENCE P. REINHOLD, Executive Vice-
President and Chief Financial Officer (and in his
individual capacity),

*Defendants-Appellees*.[1]

_____

---

[1] Although Danielle Markou has expressed her preference to be called by her married name, we find no evidence that she made a motion before the district court to change the caption of this case. We therefore use the same caption that the district court used.

Before: KEARSE, POOLER, and WESLEY, *Circuit Judges*.

Appeal from the United States District Court for the Eastern District of New York (Sandra J. Feuerstein, *J.*) granting summary judgment for Defendants-Appellees Systemax, Inc., Richard Leeds, and Lawrence Reinhold, and dismissing Plaintiff-Appellant Danielle Markou's (née Lenzi) claims under the Equal Pay Act of 1963, 29 U.S.C. §§ 206(d)(1), 215(a)(3), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a), the Pregnancy Discrimination Act of 1978, *id.* § 2000e(k), the whistleblower protections of the Consumer Product Safety Improvement Act of 2008, 15 U.S.C. § 2087, and related provisions of the New York State Labor Law and New York State Human Rights Law.

Markou claims, in sum and substance, that Defendants-Appellees paid her less than they would have if she were a man, retaliated against her when she raised concerns about her disparate pay and possible Consumer Product Safety Act violations, and fired her because she was pregnant. The district court held that Markou failed to establish a prima facie case for each of her claims. Because we conclude that there was sufficient evidence to support a prima facie case for Markou's Pregnancy Discrimination Act and Title VII claims, but insufficient

evidence to support her Consumer Product Safety Improvement Act whistleblower retaliation claim, we vacate in part the judgment of the district court and remand for further proceedings. We write to clarify that, to establish a prima facie pay discrimination claim under Title VII, a plaintiff need not first establish an Equal Pay Act violation—that is, that she performed equal work but received unequal pay. Rather, all Title VII requires a plaintiff to prove is that her employer "discriminate[d] against [her] with respect to [her] compensation . . . because of [her] . . . sex." 42 U.S.C. § 2000e-2(a)(1). Moreover, we have not yet had occasion to determine what framework applies to Consumer Product Safety Improvement Act whistleblower retaliation claims and now adopt the framework applicable to Sarbanes-Oxley Act of 2002 whistleblower retaliation claims, 18 U.S.C. § 1514A(a).

Affirmed in part, vacated in part, and remanded.

_____

PERRY S. FRIEDMAN, New York, N.Y., *for Plaintiff-Appellant Danielle Markou*.

MARK S. MANCHER, Jackson Lewis P.C. (Collin O'Connor Udell, *on the brief*), Melville, N.Y., *for Defendants-Appellees Systemax, Inc., Richard Leeds, and Lawrence P. Reinhold*.

3

BARBARA L. SLOAN, U.S. Equal Employment Opportunity Commission (James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, Anne W. King, *on the brief*), Washington, D.C., *amicus curiae in support of Plaintiff-Appellant Danielle Markou*.

POOLER, *Circuit Judge*:

Plaintiff-Appellant Danielle Markou (née Lenzi) appeals from the March 9, 2018, judgment of the United States District Court for the Eastern District of New York (Sandra J. Feuerstein, *J.*) granting summary judgment for Defendants-Appellees Systemax, Inc. ("Systemax"), Richard Leeds, and Lawrence Reinhold (collectively, "Defendants") and dismissing Markou's claims under the Equal Pay Act of 1963, 29 U.S.C. §§ 206(d)(1), 215(a)(3) (the "EPA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a) ("Title VII"), the Pregnancy Discrimination Act of 1978, *id.* § 2000e(k) (the "PDA"),[2] the whistleblower protections of the Consumer Product Safety Improvement Act of

---

[2] "In 1978, Congress enacted the Pregnancy Discrimination Act," which amended Title VII to protect employees from pregnancy discrimination. *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1344 (2015). Thus, PDA claims are themselves Title VII claims. We nevertheless refer in this opinion to Markou's pregnancy discrimination Title VII claim as a PDA claim.

2008, 15 U.S.C. § 2087 (the "CPSIA"), and related provisions of the New York State Labor Law and New York State Human Rights Law ("NYSHRL").

Markou claims, in sum and substance, that Defendants paid her less than they would have if she were a man, retaliated against her when she raised concerns about her disparate pay and possible Consumer Product Safety Act violations, and fired her because she was pregnant. The district court held that Markou had failed to establish a prima facie case for each of her claims. Because we conclude that there was sufficient evidence to support a prima facie case for Markou's PDA and Title VII claims, but insufficient evidence to support her CPSIA whistleblower retaliation claim, we vacate in part the judgment of the district court and remand for further proceedings.[3] We write to clarify that, to establish a prima facie pay discrimination claim under Title VII, a plaintiff need not first establish an EPA violation—that is, that she performed equal work but received unequal pay. Rather, all Title VII requires a plaintiff to prove is that her employer "discriminate[d] against [her] with respect to [her] compensation . . . because of [her] . . . sex." 42 U.S.C. § 2000e-2(a)(1). Moreover, we have not yet

---

[3] Markou has abandoned her EPA claims.

had occasion to determine what framework applies to CPSIA whistleblower retaliation claims and now adopt the framework applicable to Sarbanes-Oxley Act of 2002 whistleblower retaliation claims, 18 U.S.C. § 1514A(a).

**BACKGROUND**

**I.      Factual Background**

We draw the following factual background from the summary judgment record viewed in the light most favorable to Markou, the non-moving party. *See, e.g.*, *Mitchell v. City of New York*, 841 F.3d 72, 75 (2d Cir. 2016).

**A.      Markou's Compensation**

On January 22, 2008, Markou accepted a position at Systemax as Director of Risk Management. At the beginning of 2011, Systemax promoted her to Vice President of Risk Management and raised her salary. In March of 2011,[4] Markou met with Reinhold—Systemax's CFO, to whom Markou reported directly—to discuss her new role and to ask about her raise. She was surprised to learn that the raise had already gone into effect because it was so modest that she had not

---

[4] Markou testified during her deposition that this meeting took place in March of 2012; however, she also testified that this meeting took place shortly after Systemax promoted her, which occurred in 2011.

noticed it in her paycheck. Markou told Reinhold that she "was concerned that [she] wasn't paid relative to [her] peers" and that she "wanted to be treated similarly to the males." App'x at 423. When Reinhold failed to follow up, Markou contacted Leeds, Systemax's chairman and CEO. In August of 2011, following Markou's conversation with Leeds, Systemax gave Markou a more substantial salary increase. Systemax subsequently raised Markou's salary again in 2012 and 2013.

These pay raises notwithstanding, Systemax paid Markou significantly less than other, male department heads who reported to Reinhold. In fact, while Systemax (with limited exception) paid Markou's male executive-level peers salaries that exceeded the market rate for their respective positions, it paid Markou at a below-market rate.[5] For example, in 2013, Systemax paid Markou $191,000, while the benchmark salary for her position was $218,200—a $27,200 difference. In contrast, Systemax paid Benjamin White, Vice President of Internal Audit, $262,000—$32,300 more than the $229,700 benchmark salary for his

---

[5] "Market rate" here refers to rates derived from salary benchmarking data Systemax used to determine its employees' salaries.

position; it paid Thomas Axmacher, Vice President and Controller, $308,000—$40,700 more than the $267,300 benchmark salary for his position; it paid Robert Baker, European Controller, $288,000—$13,100 more than the $274,900 benchmark salary for his position.[6]

Markou continued to raise concerns about pay disparity throughout her tenure at Systemax. For example, in January of 2013, she sent Reinhold an email outlining her achievements at the company and expressing her hope that they "put [her] on par with [her] peer group on the management team and that [her] pay [would be] commensurate." App'x at 130-31. More generally, according to Leeds, Markou "complained all the time" about her pay. App'x at 389.

**B.     The Whistleblower Email**

On March 29, 2013, Markou sent an email to Leeds raising two relevant concerns. The first related to staffing issues that the resignation of another Systemax employee, Robert Wagner, had created. Systemax had hired Wagner to handle safety and workers' compensation matters, but Wagner left Systemax

---

[6] Systemax paid Curt Rush—who was Systemax's General Counsel in 2012 before he was demoted to Deputy General Counsel, the timing of which the record does not reveal—$251,000 in 2012, though the benchmark salary for a general counsel position was $471,300. Rush was no longer employed at Systemax in 2013.

because the company began requiring him to also work on product compliance matters. Markou explained that, since Wagner resigned, there was no "product compliance since there is no one to man the function." App'x at 143. She further noted that, although Systemax had authorized her to hire two part-time employees at $70,000 each to replace Wagner, that was an insufficient salary to attract prospective employees for the safety and product compliance positions.

The second concern Markou raised in her email to Leeds related to her compensation—a concern that Markou felt Systemax was inadequately addressing. She wrote to Leeds, "Relative to my peer group as an executive, I would like to be an 'Executive Officer' under the SEC and paid similar to my peers in NY – Tom, Ben, Curt, etc. . . . More than the title, I would like my pay to be more comparable." App'x at 144.

Although Markou asked Leeds not to share her email with anyone, Leeds forwarded it to Eric Lerner, Systemax's General Counsel, who then forwarded it to Reinhold. In response, Reinhold called Markou in for a meeting on April 9, 2013. During that meeting, according to Markou, Reinhold then told her that she was "basically demoted, reporting to Lerner" instead of Reinhold, and that, "if [she] left the office for any reason, even to get a coffee, [she] had to take vacation

9

time," which was "unlike any male peer in the company." App'x at 480. Reinhold memorialized this conversation in an email, which added the requirements that Markou be in the office from 8:00 a.m. to 6:30 p.m. each day and that she give Lerner and Reinhold advance notice if she were to contact Leeds again.

**C.     The California Trip Expense Report**

From April 19 to April 24, 2013, Markou traveled to Los Angeles, California, to attend a risk management conference. The conference began on Sunday, April 21. Markou had originally planned to fly from New York to Los Angeles on Saturday, April 20. However, she later arranged to arrive a day earlier so she could meet with insurance brokers and carriers before the conference began. Reinhold personally approved both the original and revised itineraries. That was consistent with two previous trips Markou had made to California for which Reinhold had approved Markou to travel a day early.

On May 20, 2013, Markou submitted her expense report for the trip. The next day, Reinhold instructed her to revise the expense report "to allocate hotel and rental car charges between personal (2 days) and business as RIMS [the risk management conference] did not start until Sunday night." App'x at 174.

Markou responded by explaining to Reinhold that she had traveled a day early because she "was going to try to meet with people on Saturday night (brokers, carriers)," but that, because "many of [her] contacts flew in on Sat[urday] night or Sunday[,] . . . it didn't work out." App'x at 174. When Reinhold told her that she should have therefore changed her travel plans, Markou further explained that it would not have been possible for her to do so.

Reinhold responded on May 22, "I did not really want to forensically examine your expense report but there is only so much BS tha[t] I can deal with. This is the end of this email trail and this issue as far as I am concerned." App'x at 172. Reinhold did not believe Markou's assertion that she was not able to change her itinerary back to her original schedule. He also noted the 322 miles Markou had put on her rental car and opined that Markou must have taken a personal road trip during the weekend before the conference began. He concluded, "Bottom line – the first two days of hotel and rental car are personal. Adjust the report." App'x at 172.

When Reinhold was unwilling to discuss the matter further in person, Markou met with Lerner. During that May 31, 2013, meeting, Markou also disclosed to Lerner that she was pregnant.

11

On June 10, 2013, Markou made another attempt to persuade Reinhold to approve her expense report. She again reiterated that she "went a day earlier to accommodate" meetings with insurance brokers and carriers, that she told those brokers and carriers that she would be available to meet on Saturday and Sunday, and that the meetings did not happen "due to logistics of Los Angeles." App'x at 176. She added that the trip extension was not for personal reasons, explaining that she "would have rather have been home than traveling alone." App'x at 177. She also informed Reinhold that she was pregnant: "I also was sick with morning sickness and complete exhaustion from my first trimester of pregnancy. The last thing I cared about doing was extending a business trip." App'x at 177.

In response, Reinhold told Markou that he would reconsider his decision if Markou provided "[c]ontemporaneous emails from brokers and carriers (that are not NYC-based) that set up specific meetings with you for business purposes on that Friday night or Saturday morning," as well as emails with those brokers and carriers showing that they had canceled those meetings shortly before they were scheduled to take place. App'x at 176. Reinhold also required Markou to submit contemporaneous emails with Systemax's travel agent showing that Markou

12

"attempted to change [her] outbound flight immediately upon learning the meetings were canceled," but that no flights were available on Sunday. App'x at 176.

Markou responded by providing what documentation she could gather to meet Reinhold's request. She also reiterated that, at the time of her trip, she was not feeling well because of her pregnancy and would have rather been home than traveling to California for business.

### D. Internal Audit and Termination

Dissatisfied with Markou's response, on June 13, 2013, Reinhold asked White, Systemax's Vice President of Internal Audit, to conduct an internal audit of Markou's expense report. Such an audit into an expense report was the first of its kind at Systemax. Although the audit started with a circumscribed scope, White, for reasons the record does not reveal, expanded it to include a review of Markou's emails and an investigation into other possible violations of corporate policy.

On or about June 18 and 19, 2013 and while the internal audit was underway, Lerner placed into Markou's personnel file several emails and a memorandum, which allegedly showed that Markou's job performance was

13

subpar. Before this time, Markou had generally received positive performance reviews.

During the course of White's investigation, he met with Markou twice. The second meeting, on June 20, was to give Markou "the opportunity to resign from the company." App'x at 576. Markou declined. Based on the purported violations of corporate policy the audit had uncovered, Systemax placed Markou on administrative leave on June 21. On June 24, Markou responded to the internal audit's findings, noting the pressure she had received to resign from the company and the fact that she was in no position to resign, in part, because she needed health insurance coverage "in view of [her] high-risk pregnancy." App'x at 898.

On June 26, 2013, White finalized a report memorializing the audit's findings, at least one of which was misleading. It stated that Markou falsely told Systemax "that she attended every conference session on Wednesday." App'x at 204. However, the only portions of the conference Markou had missed on that day were a luncheon and entertainment by comedian Howie Mandel, neither of which qualified for continuing education credits. Nevertheless, Systemax

14

concluded that Markou's response to the audit's findings was inadequate and fired her the same day.

**II.    Procedural History**

Markou filed the present suit on December 24, 2014. She filed an amended complaint on March 26, 2015, and a second amended complaint on September 22, 2015. On March 10, 2017, Defendants moved for summary judgment. On March 9, 2018, the district court granted the motion and dismissed Markou's second amended complaint in its entirety with prejudice. Markou timely appealed.

**DISCUSSION**

"We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001). Thus, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (internal quotation marks omitted). We do not "weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). A party is only entitled to summary judgment if she "shows that there is no genuine dispute as

to any material fact and [she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**I.     Pregnancy Discrimination[7]**

"The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young*, 135 S. Ct. at 1343. It provides, in relevant part, that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

As with other Title VII claims, we apply "the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 [(1973)]." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400-01 (2d Cir. 1998). As relevant here, a PDA plaintiff establishes a prima facie case "by showing that: (1) she is a member of a

---

[7] "We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008). The parties here address Markou's PDA and NYSHRL pregnancy discrimination claims together. We do as well.

protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) . . . the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." *Id*. at 401 (internal quotation marks omitted).

"As we have often emphasized, the burden of establishing this prima facie case in employment discrimination cases is minimal." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (internal quotation marks omitted) (collecting cases); *see also, e.g.*, *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (describing a plaintiff's burden as "*de minimis*" at the prima facie stage (internal quotation marks omitted)). Moreover, "[a]n employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). "So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.* (emphasis added).

17

If the plaintiff establishes a prima facie case, "a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." *Legg v. Ulster County*, 820 F.3d 67, 73 (2d Cir. 2016). "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Id.* at 73-74.

Here, the district court erroneously held that Markou failed to establish the fourth prong of her prima facie case—that "the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." *Kerzer*, 156 F.3d at 401. Markou relies on the temporal proximity between the time she disclosed her pregnancy and her termination to establish an inference of unlawful discrimination. We agree that the sequence of events in this case is sufficient to raise the inference of discrimination necessary for Markou to carry her de minimis burden to establish a prima facie case. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) ("[T]emporal proximity between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee . . . may . . . support . . . an inference of pregnancy

18

discrimination."); *cf. El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.").

As detailed above, Markou told Lerner on May 31, 2013, that she was pregnant. Shortly thereafter, on June 10, she told Reinhold she was pregnant. Three days later, Reinhold turned a dispute over a reimbursement request into a first-of-its-kind internal audit of Markou's expense report—notwithstanding Reinhold's earlier representation that he would reconsider providing Markou with full reimbursement for her trip if she provided additional documentation. That internal audit grew in scope to sweep in other purported corporate policy violations. Between June 18 and 19, 2013, Lerner placed into Markou's personnel file several emails and a memorandum that sought to show that Markou's job performance was deficient. Systemax then placed Markou on administrative leave on June 21, 2013. Markou responded to the audit's accusations on June 24, again noting the fact that she was pregnant. Systemax then fired her on June 26,

2013—less than a month after Markou told Lerner she was pregnant and approximately two weeks after she told Reinhold.

This timeline of events is sufficient to raise the inference, at the prima facie case stage, that Systemax discriminated against Markou because of her pregnancy. We therefore vacate the district court's dismissal of Markou's PDA and related state-law claims.

## II. Title VII Pay Discrimination

Title VII makes it unlawful for an employer to, among other things, "discriminate against any individual with respect to his [or her] compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). An employee need only show that sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m). We analyze Title VII claims "under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*," outlined above. *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).

Here, the district court held that Markou's Title VII pay discrimination claim failed at the threshold because she did not establish "that the positions held by her purported [male] comparators are substantially equal to her

position," as required by the EPA. Special App'x at 48-49. The district court alternatively held that, even if Markou had made that threshold showing, she failed to present evidence of discriminatory intent. The district court erred in both respects: a Title VII plaintiff need not satisfy the EPA's unequal pay for equal work standard, and Markou did present sufficient evidence of discriminatory intent to establish a prima facie case.

### A. Title VII Does Not Require a Showing of Unequal Pay for Equal Work

As a preliminary matter, Defendants argued below that, "[i]n order to establish pay discrimination in violation of Title VII and the NYSHRL, Plaintiff must demonstrate, just as she must in the EPA context, that the positions held by her purported comparators are substantially equal to her own." Defs.' Mem. Law Supp. Mot. Summ. J. at 14-15, No. 14-cv-7509-SJF-ARL (E.D.N.Y. Mar. 10, 2017), ECF No. 59-5. Markou embraced this erroneous statement of law, rather than contesting it, stating that her "disparate pay claims under Title VII and the NYSHRL . . . share the same elements as the EPA and NY EPA claims, [but] require an additional showing of discriminatory animus." Suppl. App'x at 9 n.2.

Such a concession ordinarily precludes a party from advancing a different argument on appeal.

Nevertheless, the rule against entertaining arguments "raised for the first time on appeal . . . is prudential, not jurisdictional," and we therefore "have discretion to consider" them. *Sniado v. Bank of Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004). "Exercise of that discretion is particularly appropriate where an argument presents a question of law and does not require additional fact finding." *United States v. Brunner*, 726 F.3d 299, 304 (2d Cir. 2013). We exercise our discretion here to clarify an important, purely legal issue.

District courts in this Circuit routinely invoke our statement that "[a] claim of unequal pay for equal work under Title VII and the [NYS]HRL is generally analyzed under the same standards used in an EPA claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see, e.g., Mauze v. CBS Corp.*, 340 F. Supp. 3d 186, 206 (E.D.N.Y. 2018); *Heap v. County of Schenectady*, 214 F. Supp. 2d 263, 270-71 (N.D.N.Y. 2002); *Dinolfo v. Rochester Tel. Corp.*, 972 F. Supp. 718, 722 (W.D.N.Y. 1997). This statement in *Tomka* recognized that to establish a prima facie case under both the EPA and Title VII of wage discrimination on the basis of sex,

22

plaintiffs generally must demonstrate their membership in a protected class that receives unequal pay for substantially the same work. *See Belfi v. Prendergast*, 191 F.3d 129, 135, 139 (2d Cir. 1999) (articulating the elements of a prima facie case under the EPA and Title VII, and noting, "[a] claim of unequal pay for equal work under Title VII . . . is generally analyzed under the same standards used in an EPA claim." (quoting *Tomka*, 66 F.3d at 1312)). *Tomka* also recognized, however, that EPA and Title VII plaintiffs face different burdens: "unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus." *Tomka*, 66 F.3d at 1313. And *Tomka*'s statement itself relied on *Laffey v. Northwest Airlines, Inc.*, which explained that "the provisions of both acts should be read in pari materia, and neither should be interpreted in a manner that would undermine the other." *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 446 (D.C. Cir. 1976), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); *see also Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 132 (2d Cir. 1996) (finding that though "Title VII and the [EPA] are interrelated," the district court erred in applying the EPA's statute of limitations to a Title VII claim that the district court construed as an EPA claim).

We take this opportunity to clarify that a Title VII plaintiff alleging a discriminatory compensation practice need not establish that she performed equal work for unequal pay. By its plain terms, Title VII makes actionable *any* form of sex-based compensation discrimination. 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his [or her] compensation . . . because of such individual's . . . sex . . . ."). To be sure, one way an employer might discriminate against an employee because of her sex is to pay her less than her male peers who perform equal work. In such circumstances, an employee may seek redress under the EPA or, if the circumstances admit "an inference of discrimination," Title VII. *Belfi*, 191 F.3d at 140.

However, it by no means follows that this is the only way in which an employer might achieve its discriminatory purpose. For example, an employer might "hire[] a woman for a unique position in the company," but then pay her less than it would "had she been male." *Washington County v. Gunther*, 452 U.S. 161, 179 (1981). If a Title VII plaintiff were first required to establish an EPA violation, she would be without redress under those circumstances, even if her employer flatly "admitted that her salary would have been higher had she been

24

male." *Id.* "Similarly, if an employer used a transparently sex-biased system for wage determination, women holding jobs not equal to those held by men would be denied the right to prove that the system is a pretext for discrimination." *Id.*

In other words, grafting the EPA's equal-work standard onto Title VII would mean "that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." *Id.* at 178. Such a rule finds no support in the text of Title VII and would be inconsistent with Title VII's broad remedial purpose, which counsels against "interpretations of Title VII that deprive victims of discrimination of a remedy, without clear congressional mandate." *Id.*; *cf. City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) ("In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." (internal quotation marks omitted)); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) ("[I]n enacting Title VII of the Civil Rights Act of 1964, Congress intended to prohibit all practices in

25

whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin.").

In short, Title VII does not require a plaintiff alleging pay discrimination to first establish an EPA violation—that is, that she received less pay for equal work. Rather, all Title VII requires a plaintiff to prove is that her employer "discriminate[d] against [her] with respect to [her] compensation . . . because of [her] . . . sex." 42 U.S.C. § 2000e-2(a)(1). Thus, a claim "for sex-based wage discrimination can be brought under Title VII even though no member of the opposite sex holds an equal but higher paying job, provided that the challenged wage rate is not based on seniority, merit, quantity or quality of production, or any other factor other than sex." *Gunther*, 452 U.S. at 168 (internal quotation marks omitted).

**B.     Markou Made a Sufficient Showing of Discriminatory Intent**

Markou has made a sufficient prima facie showing of discriminatory intent. First, as illustrated in Table 1 below, Systemax paid Markou at a rate that was below market for her position. At the same time, it paid nearly all of Markou's male executive peers above market rate for their respective positions.

26

**Table 1**

| | Markou, J.D. | White, C.P.A. | Baker, C.P.A. | Axmacher |
|---|---|---|---|---|
| **Job Title** | VP, Head of Risk Management | VP of Internal Audit; Head of Internal Audit Dep't | European Controller | VP and Controller; Principal Accounting Officer |
| **Approximate Relevant Experience** | 13 yrs. | 19 yrs. | 24 yrs. | 28 yrs. |
| **Systemax Experience** | 5 yrs. | 6 yrs. | 5 yrs. | 7 yrs. |
| **2013 Bench-marking 50th Percentile Salary** | $218,200 | $229,700 | $274,900 | $267,300 |
| **2013 Salary** | $191,000 | $262,000 | $288,000 | $308,000 |
| **Percentage of Bench-mark** | 87.5% | 114.1% | 104.8% | 115.2% |

These statistical differences permit an inference of discrimination. In fact, the Supreme Court reached a similar conclusion in *Gunther*. There, the Court affirmed the Court of Appeals' remand for further proceedings under Title VII—but not the EPA—because the female plaintiffs had demonstrated that their employer "evaluated the worth of [men's and women's] jobs . . . [and] determined that [women] should be paid approximately 95% as much as [their male counterparts,] . . . [but then] paid them only about 70% as much, while paying the male [employees] the full evaluated worth of their jobs." *Id.* at 180-81.

27

Second, during Markou's deposition, she testified that Reinhold made graphic comments about his dating and sex life, made disparaging remarks about his ex-wife, and "would comment on women's bodies. He would send out emails about stereotypical things with women. He would email fat pictures about women. He would comment on who he would do [i.e., have sex with] within the organization and there were many, many more." App'x at 415. Reinhold also commented on the way Markou dressed at work. In her 2009 performance review, Reinhold stated that he wanted Markou "to focus . . . on her executive image." App'x at 409. He also once commented that he thought a skirt Markou wore to work was too short. According to Markou, Reinhold did not comment on the physical appearance of the men who reported to him.

The district court dismissed this testimony as evidence of mere "stray remarks" that were insufficient to state a discrimination claim. Special App'x at 49 (internal quotation marks omitted). While it is true that stray remarks, "*without more*, cannot get a discrimination suit to a jury," *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998), as noted above, Markou has more: she has evidence suggesting that she was paid below the market rate for her position while similarly situated men were paid above the market rate for their respective

positions. When "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Id.*

On that score, we consider four factors when assessing the probative value of such remarks:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). No single factor is dispositive. *Id.* at 150. Here, Markou's deposition testimony was not that Reinhold made one or two stray comments about women that might suggest a discriminatory motive. Rather, Markou's testimony suggests that Reinhold's comments were pervasive—that he consistently made remarks about his sex life and about women. Moreover, Reinhold held a senior role at the company; he was Systemax's CFO.

Taken together, the fact that Systemax paid Markou below the market rate for her position while paying her male peers above market rate, along with Reinhold's pervasive disparagement of women, are enough to carry Markou past the prima facie stage. We therefore vacate the dismissal of Markou's Title VII pay discrimination claim.

**III.    Title VII Retaliation**

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his [or her] employees . . . because he [or she] has opposed any practice made an unlawful employment practice by" other provisions of Title VII. 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are analyzed under the same *McDonnell Douglas* framework articulated above in the discussion of Markou's PDA and Title VII pay discrimination claims. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). At step one, a plaintiff establishes her prima facie case "by showing (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (internal quotation marks omitted). As with Markou's

other Title VII claims, her "burden in this regard is *de minimis*." *Id.* (internal quotation marks omitted).

Here, the district court again erroneously held that Markou's claim failed at the prima facie case stage. The court concluded that Markou failed to establish that she engaged in any protected activity. We disagree.

Markou argues that she engaged in protected activity when she sent Leeds her March 29, 2013, email. In that email, she wrote, in relevant part, the following:

- My next concern, aside from not having the resources or tools is in regards to compensation. It is not where I would have hoped given some of the remarkable results I have been able to deliver the past 5-6 years.

- I have mentioned my concerns, but do not believe they are being adequately addressed. Relative to my peer group as an executive, I would like to be an "Executive Officer" under the SEC and paid similar to my peers in NY – Tom, Ben, Curt, etc. I do not think this is an unrealistic expectation. I was told Heads of Risk Management cannot be "EOs" which actually isn't true. More than the title, I would like my pay to be more comparable.

- This past year, after delivering a $5M policy limits settlement with our carrier, I was paid the lowest I have made in my career at Systemax and the bonus

31

was the lowest in my career in running RM departments. This is even more difficult in a year where we are paying for a wedding and saving for a home.

App'x at 144-45.

The district court focused on the word "peers" and concluded that, "[a]t most, [Markou] has conveyed a desire to be paid like her fellow executive colleagues. The fact that those colleagues are male does not *per se* morph [her] complaint into one of gender-based discrimination." Special App'x at 53. The district court also found "nothing in [Markou's] communications with the Defendants that would have put them on notice that [she] believed gender-based discrimination was occurring." Special App'x at 54.

The problem with this reading of Markou's email is that it does not fully account for the context in which Markou sent it. Markou testified during her deposition that, during a March 28, 2012, meeting with Reinhold, she "told him [she] was concerned that [she] wasn't paid relative to peers and that [she] was performing really well and [she] had done a good job for the company and [she] wanted to be treated similarly to the males." App'x at 423. She also testified that, in other conversations with Reinhold about her compensation, she used the word

"males," as well as "peers."[8] App'x at 428-29. Thus, we are not constrained by reading the word "peers" in isolation. Rather, Markou used that word in a context that reasonably suggested she was taking issue with being paid less than her *male* peers.

Standing alone, Markou's email may well be insufficient to establish that she engaged in protected activity. We need not answer that question, however, because Markou's email, read in context, is sufficient to meet her minimal burden at the prima facie stage. We therefore vacate the district court's dismissal of Markou's Title VII retaliation claim.[9]

---

[8] Although Markou sent this email to Leeds, it was ultimately forwarded to Reinhold.

[9] Defendants alternatively argue, inter alia, that Markou's termination was not causally related to her protected activity. Even if that were so, after Markou's email, Reinhold "basically demoted" her and subjected her to selectively enforced strict work requirements to which her male counterparts were not subject. App'x at 480. We are satisfied that those actions, for which a jury could rationally infer that Markou's email provided the only basis, fit the broad definition of adverse employment action in the Title VII retaliation context—namely, "actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

## IV.  CPSIA Whistleblower Retaliation

As relevant here, CPSIA affords whistleblower protections to an employee who "provided, caused to be provided, or is about to provide or cause to be provided to the employer . . . information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of" the Consumer Product Safety Act or related consumer product safety statutes or regulations, 15 U.S.C. § 2087(a)(1), or "objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of" the Consumer Product Safety Act or related consumer product safety statutes or regulations, *id.* § 2087(a)(4). In general, § 2087(a) protects employees who refuse to participate in conduct that violates the Consumer Protection Safety Act, or who furnish their employers or the government (state or federal) with information related to a Consumer Protection Safety Act violation. *See Wilson v. EI DuPont de Nemours & Co*, 710 F. App'x 57, 57 (3d Cir. 2018) (nonprecedential per curiam opinion).

We have not yet had occasion to articulate the standards that apply to CPSIA whistleblower retaliation claims and now adopt the framework applicable to Sarbanes-Oxley Act ("SOX") whistleblower retaliation claims. Crucially, as

34

relevant here, both statutes contain the requirement that the whistleblower "reasonably believes" there is a violation. *Compare* 18 U.S.C. § 1514A(a)(1) (SOX whistleblower statute protecting providing information about "any conduct which the employee reasonably believes constitutes" fraud), *with* 15 U.S.C. §§ 2087(a)(1), (4) (providing protections to employees who provide information about or object to participating in activity they "reasonably believe[]" to be a violation of the Consumer Product Safety Act or related laws or regulations).

Thus, to prevail on a CPSIA whistleblower retaliation claim, an employee must establish the following elements required to prove an SOX whistleblower retaliation claim: "(1) he or she engaged in a protected activity; (2) the employer knew that he or she engaged in the protected activity; (3) he or she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 451 (2d Cir. 2013). "If the employee proves these four elements, the employer may rebut this *prima facie* case with clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected behavior." *Id.*

To meet the "reasonable belief" standard, "a plaintiff must show not only [1] that he [or she] believed that the conduct constituted a violation, but also [2] that a reasonable person in his [or her] position would have believed that the conduct constituted a violation." *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) (internal quotation marks omitted). In other words, the term "reasonable belief contains both subjective and objective components." *Id.* "The objective prong of the reasonable belief test focuses on the basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Id*. (internal quotation marks omitted).

Here, Markou relies on two emails. The first is a March 11, 2013, email she sent to Reinhold indicating that, with regards to "the product position" she was trying to fill after Wagner's departure from Systemax, "[w]e just can't go bare on this." App'x at 139. The second is the above-discussed March 29, 2013, email to Leeds. The relevant portion of that email reads as follows:

- I feel like I am being asked to do an impossible job without the necessary tools and resources to manage two functions (Worldwide Risk Management and Product Compliance).

36

- As of this email, there isn't any product compliance since there is no one to man the function after Bob Wagner left the company.

. . . .

- I was advised first that Larry [Reinhold] would talk to Richard [Leeds] to get two needed headcount – one for safety and another for product compliance. When I followed up, I was told that it was decided that those were only two part time headcount. This can't be.

- The first week I am back (this week), I received the good news about getting two new headcount – one for safety and the other for Product Compliance/CPSC, only I am given what seems to be an impossible hurdle of hiring each position for only $70K.

- Our research on pay for a compliance position (where this person would be the main product expert for vetting, cpsc, etc) indicates a salary range in excess of $120K. Additionally, last year when the search was conducted, this backed up the expected range. Of course, it is my expectation that we will try to hire for as low as possible, but these are the facts.

- Similarly, on the safety function, the outgoing manager earned over $110K. My concern is that I don't feel I am being [listened] to and I am asked to sign off on a 2013 bonus document that includes two nearly impossible goals from the start.

App'x at 143-44. Below, the district court held that these emails failed to show that she raised any Consumer Product Safety Act–related concerns.

However, even assuming, arguendo, that Markou engaged in protected activity because she "reasonably believed that the lack of an employee responsible for the compliance function placed the company at significant risk of violations of the law," Appellant's Br. at 54, her claim nevertheless fails. Markou has not satisfied the second retaliation prong—that Systemax "knew that . . . she [had] engaged in . . . protected activity." *See Bechtel*, 710 F.3d at 451. First, as to Markou's March 11 "go bare" email, we agree with the district court that, when read in conjunction with an October 5, 2012, email Markou sent to Reinhold in which she used similar phraseology, it was clear that Markou's concern related to Systemax's liability exposure and related insurance coverage implications— not that Systemax was violating the Consumer Product Safety Act or related law or regulations. Indeed, nothing in Markou's March 11 email suggests that she was raising a concern that Systemax was violating any law at all. And although Markou quotes this email in her brief in this Court, she makes no argument that it provided a basis for her CPSIA whistleblower retaliation claim.

Second, Markou does not cite any particular consumer product safety law or regulation that Systemax was violating or even risked violating by not acceding to the staffing request she referenced in her March 29 email. She does not argue, for example, that the law imposes any sort of specific product compliance staffing requirement. Moreover, although Markou testified during her deposition about various product-related issues that she had been responsible for managing while at Systemax, she does not explain how those issues themselves violated the law—and, even if they did, why a part-time employee would have been inadequate to prevent future product issues or, likewise, why a full-time employee would have prevented any future product issues. As with the March 11 email, we are unable to identify anything in Markou's March 29 email that would have notified Systemax that she was "engag[ing] in . . . protected activity." *See id.*

In sum, we import to CPSIA whistleblower retaliation claims the framework applicable to SOX whistleblower retaliation claims. Applying that framework here, we agree with the district court that Markou has failed to establish a CPSIA whistleblower retaliation claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court dismissing Markou's PDA, Title VII pay discrimination, Title VII retaliation, and related state-law claims is hereby VACATED, the dismissal of Markou's CPSIA whistleblower retaliation claim is hereby AFFIRMED, and the case is REMANDED for further proceedings.